130 So.2d 800 (1961)
Joel E. KEENAN, Plaintiff-Appellee,
v.
W. D. WACTOR et al., Defendants-Appellants.
No. 273.
Court of Appeal of Louisiana, Third Circuit.
May 22, 1961.
Rehearing Denied June 13, 1961.
*801 Gold, Hall & Skye, by George B. Hall, Alexandria, for defendant-appellants.
Roy S. Halcomb, Ferriday, for plaintiff-appellee.
Before TATE, HOOD, and CULPEPPER, JJ.
TATE, Judge.
The plaintiff was awarded damages for personal injuries sustained when struck by a Ford vehicle driven by T. D. Penniston, the grandson of the vehicle's owner, W. D. Wactor. Wactor, and also his insurer under a Garage Liability Policy, were cast in judgment.
These defendants appeal, urging that the trial court erred in holding:
(1) that the negligence of Penniston, the Ford's driver, was the sole proximate cause of the accident;
(2) that the Garage Liability Policy issued by the co-defendant insurer covered operation of the Ford vehicle involved in the accident; and
(3) that Wactor was individually liable for his minor grandchild's tort.

I.
The accident occurred at about 6:00 p. m. on October 10, 1958, just after dark. The plaintiff, then aged over eighty years, was struck while crossing on a foot a blacktopped street in front of his home on the outskirts of the village of Clayton. Prior to the accident, the defendants' vehicle, driven by Penniston, was approaching from the east, while the plaintiff was crossing the 16-foot-wide roadway at an angle from north to south. About seventy feet from the point of impact there was a street light which, the town marshal testified without substantial contradiction, was bright enough to illuminate the entire area involved in the accident.
Penniston first saw the plaintiff when that aged pedestrian was about halfway (4') across the north (8') lane of the highway, in which lane Penniston's vehicle was approaching at a speed of 20 mph. At that time Penniston was in a gradual curve's center, which the uncontradicted testimony shows to have been 92' from the point of impact. Penniston, thinking that the pedestrian might stop if he saw the oncoming vehicle, veered to his own left and into the southbound lane. He struck the pedestrian when the latter had crossed into the south lane at least two feet beyond the highway's center line.
Penniston admitted that he did not apply his brakes until he struck the old man, which is corroborated by the circumstance that there were no brake marks. His vehicle stopped at the point of impact, corroborating his estimate of his own slow speed, but also indicating that he could have stopped far sooner had he applied his brakes prior to the impact. Under this driver's own testimony, as related to the physical facts, the accident would not have occurred if the motorist had stopped or slowed upon seeing the aged pedestrian ahead in his path, instead of attempting to *802 cross around him without slackening the vehicle's speed.
As was recently stated in Ingram v. McCorkle, La.App. 1 Cir., 121 So.2d 303, 304-305:
"Our courts have held that a motorist has the last clear chance to avoid an accident and is therefore liable, despite the gross and continuing negligence of a pedestrian, where the motorist could have, in time reasonably to have avoided the accident, perceived a pedestrian in the process of crossing the roadway with the obvious intention of proceeding into the motorist's path while unaware of the motorist's approach. Rottman v. Beverly, 183 La. 947, 165 So. 153; Zachery v. Southern Farm Bureau Cas. Ins. Co., La.App. 1 Cir., 116 So.2d 847; Guillory v. Lemoine, La.App. 2 Cir., 87 So.2d 798. `Under the last clear chance doctrine as enunciated by Louisiana jurisprudence, a motorist who observes or who should by the exercise of reasonable care have observed another in a position of peril may be held responsible for injuries caused by an ensuing collision with the other despite any contributory negligence on the part of the latter if, after the duty to make such observation arose, the motorist could reasonably have avoided the accident. [Citations omitted]', Belshe v. Gant, 235 La. 17, 102 So.2d 477, 479."
See also Broussard v. Thompson, La.App. 3 Cir., 128 So.2d 477.

II.
The co-defendant insurer issued a Garage Liability Policy to W. D. Wactor, the owner of the 1951 Ford driven at the time of the accident by Penniston with Wactor's consent. The policy insured the legal liability of Wactor (as the named insured) or of Penniston (as the additional or omnibus insured) for accidentally-caused personal injuries resulting from the operation of motor vehicles included within the hazard defined in the policy as:
"The ownership, maintenance or use of the premises for the purpose of an automobile sales agency, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, an executive officer thereof, or a member of the household of any such person".
In arguing that in the present case the policy did not afford coverage for the Ford involved in the accident, the defendant insurer points out that the vehicle in question was used only occasionally in Wactor's service station business, in connection with which business the policy was issued, and contends that, since a Garage Liability Policy is designed primarily to afford protection against liabilities which might arise out of the operation of a filling station or garage, such a policy does not afford coverage for an automobile being used for pleasure purposes at the time of the accident unless such automobile is used principally in the operation of such business.
The principles applicable to construction of insurance policies were recently restated by us in Hardee v. Southern Farm Bureau Cas. Ins. Co., La.App. 3 Cir., 127 So.2d 220, 221-222 (citations omitted):
"* * * In case of ambiguity, the policy provisions are construed most favorably to the insured and against the insurer, and of the permissible constructions that will be adopted which effectuates the insurance over *803 that which defeats it. * * * On the other hand, in the absence of conflict with statute or public policy, insurers have the same right as individuals to limit their liability and to impose whatever conditions they please upon their obligations, and in such event unambiguous provisions limiting liability must be given effect. * * *"
The evidence reflects that the Ford was used "some, not much" in Wactor's service station business (Wactor, Tr. 34); or, as Penniston stated, "partially used" (Tr. 64) in the service station business, as an auxiliary vehicle available "maybe once or twice a week" to go on road service or to pick up customer's cars when a truck also maintained at the service station was not available. There is no evidence that the Ford was ever used for any other business purpose. Although Penniston stated that this vehicle was mostly used for the owner's personal use, his testimony also indicates that Wactor maintained another passenger vehicle referred to as "his" [Wactor's] car". (Tr. 66). Penniston, who worked at his grandfather's service station from 5:30 a. m. to 5:30 p. m., and who lived in his grandfather's household, himself brought the Ford to work at the service station at least once or twice a week.
Referring back to the above-quoted definition of the hazard insured by the present insurer's Garage Liability Policy, the risks insured, pertinently to this litigation, are, in our opinion:
(a) the ownership, maintenance and use of any automobile in connection with service station operations;[1]
(b) the occasional use for other business purposes of (1) any automobile "used principally" in the insured's service station operations and also of (2) any automobile owned by the named insured "in connection with" his service station operations for the use of the named insured or a member of his household;[2]
(c) the use for non-business purposes of (1) any automobile "used principally" in the insured's service station operation and also of (2) any automobile owned by the named insured "in connection with" his service station operations for the use of the named insured or a member of his household.
Despite appellants' able argument that only vehicles "used principally" in the service station business are covered while being used for non-business purposes, this argument overlooks that the policy definition additionally includes as an insured risk: "the use for non-business purposes of * * * (2) any automobile owned by the name insured in connection with * * * [service station] operations for the use of the named insured * * * or a member of the household of [the insured] * * *" (Italics ours.)
In the context of the policy, as accorded the required liberal construction in favor of affording insurance protection, the meaning of insuring a vehicle "owned in connection with [service station] * * * operations for the use of the named insured" or a member of his householdas distinguished from the meaning of insuring one "owned * * * and used principally in" such operationsincludes at least, as here, the coverage of a vehicle owned by the named insured and used regularly *804 and habitually in his service station operations, without any requirement that such regular use for service station operations be more substantial than the present. To own a vehicle "in connection with" service station operations means only that its ownership must be related to or associated with service station operations, without any necessary connotation that the primary or only purpose of ownership or use of the vehicle be for such service station use. See: 8A Words and Phrases, Verbo Connect p. 157, Connected With p. 160, etc.; 20A Words and Phrases Verbo In Connection With p. 332; Webster's Unabridged International Dictionary (2nd Ed., 1959), Verbo "Connect" and "Connection" (p. 565). See also: Terbell, "Automobile Garage Liability Policy", Insurance Law Journal (October, 1954) 668 at 675.
The defendant cites American Cas. Co. of Reading, Pa. v. Senecal, 1956, 100 N.H. 261, 124 A.2d 199, and Hardware Mut. Cas. Co. v. Wedlinger, 4 Cir., 1944, 146 F.2d 984, as holding that, to be covered by a Garage Liability Policy, the vehicle must be used principally in the garage business; however, as these cases indicate, they concerned an earlier form of the insuring coverage of such policies which, unlike the present policy, did so restrict their coverage.[3] In Peirson v. American Hardware Mut. Ins. Co., 1959, 249 N.C. 580, 107 S.E.2d 137, also cited by defendants-appellants, at issue only was whether a Garage Liability Policy insured the use for pleasure purposes of an automobile used principally for non-garage "other business" purposes of the insured (cf., footnote 2 above); and the decision, while containing some language favorable to able counsel's contention, is not very persuasive as to the present facts, for in the present case the ownership of the vehicle was not for use in any other business, but rather it was owned in connection with garage purposes, since the vehicle was customarily used as an auxiliary service station vehicle.
We affirm the trial court's holding that the operation of the defendant insured's Ford involved in the accident and used at that time with his consent was covered by the co-defendant insurer's Garage Liability Policy.

III.
Without assigned reasons the defendant Wactor was also held liable in the trial court for the tort caused by his grandson, Penniston, who had been living in the former's home since shortly before the accident. It is conceded that at the time of the accident Penniston was on a personal mission unconnected with his grandfather. Since a grandfather not qualified as tutor of his grandchild is not liable for the latter's torts in the absence of special circumstances not shown here (LSA-Civil Code Art. 2318; Jackson v. Ratliff, La.App. Orleans, 84 So.2d 103), it was error to hold the defendant Wactor liable herein, and the judgment will be amended so as to dismiss the suit insofar as such defendant is concerned.

Conclusion.
The trial award of the policy limits is shown by the record to be well justified by the serious, painful, and crippling injuries sustained by the defendant.
For the reasons more fully set forth above, the trial court judgment is amended so as to dismiss this suit as against the defendant W. D. Wactor; as thus amended, *805 it is affirmed in all other respects, at the cost of the co-defendant appellant, the Traders & General Insurance Company.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
NOTES
[1] Thus the insurer is clearly liable for negligent operation of motor vehicles actually being used in connection with service station operations at the time of the accident.
[2] Thus, while occasional use for other business purposes than the service station business is covered by the policy, the policy coverage apparently does not extend to accidents sustained while the vehicle is used for such "other business purposes" if the use in other businesses of such vehicle has been more substantial than occasional. The apparent purpose of this limitation is to avoid insuring the risks of cars principally used in businesses other than the garage or service station business for which the insurance was issued.
[3] As a matter of fact, the present Garage Liability Policy indicates in its text that under a former standard definition of these policies the insured hazard was restricted to the use for non-business purposes of vehicles "used principally" in the garage business, but that by a 1955 amendment the standard insuring definition was expanded into its present form to include also the use for non-business purposes of vehicles owned "in connection with" service station operations for the use of the named insured or a member of his household. It is this additional and expanded coverage to which we give effect herein. See Terbell, "Automobile Garage Liability Policy", Insurance Law Journal (Oct. 1954) 668 at 675.