152 So.2d 88 (1963)
Rosa Russo CAMPISI, Plaintiff and Appellee,
v.
The FIDELITY AND CASUALTY COMPANY OF NEW YORK et al., Defendants and Appellants.
No. 786.
Court of Appeal of Louisiana, Third Circuit.
April 9, 1963.
Rehearing Denied May 1, 1963.
Certiorari Refused June 5, 1963.
*89 Plauche & Stockwell, by Fred Sievert, Jr., and Oliver P. Stockwell, Lake Charles, Broussard & Broussard, by Marcus A. Broussard, Jr., Abbeville, for defendantsappellants.
Voorhies, Labbe, Voorhies, Fontenot & Leonard, by H. Lee Leonard and Bennett Voorhies, Lafayette, for plaintiff-appellee.
Before SAVOY, TATE and HOOD, JJ.
HOOD, Judge.
This is an action for damages instituted by Mrs. Rosa Russo Campisi against Marion Guidry and the latter's liability insurance carrier, The Fidelity and Casualty Company of New York. After trial on the merits, judgment was rendered by the trial court in favor of plaintiff awarding her the sum of $7,759.07 as damages, and defendants have appealed. Plaintiff has answered the appeal demanding that the amount of the award be increased.
The evidence shows that plaintiff, a 72year-old woman, was struck by an automobile as she was attempting to walk across Louisiana Highway 82 at a point two-tenths of a mile south of the corporate limits of the City of Abbeville. The automobile was owned by defendant, Marion Guidry, and at the time of the accident it was being driven by his 18-year-old son, Kenneth L. Guidry.
The accident occurred about 7:45 p. m., between dusk and dark. The weather was clear and visibility was good for that time of day, although most of the vehicles on the road at that time were using their headlights. The highway at that point is a blacktopped, heavily traveled thoroughfare, running north and south, the hard-surfaced portion being 24 feet wide, with four-foot shoulders on each side. Although the accident occurred outside the city limits of Abbeville, residences were located along both sides of the highway in that area, and the legal speed limit for motor vehicles there was 35 miles per hour. There was no street intersection in that immediate vicinity, and the place where the accident occurred *90 is not shown to have been designated or customarily used as a pedestrian crossing.
Just prior to the accident plaintiff and her 16-year-old grandson were standing on the east side of the highway, about six and one-half feet east of the edge of the blacktopped strip, waiting for traffic to ease up enough to allow them to walk across the highway safely. After waiting for about five cars to pass, the grandson turned around to set some coke bottles on the ground, and while he was doing so plaintiff started to walk across the highway alone. She succeeded in traversing most of the width of the highway, but was struck while in the southbound lane of traffic when she reached a point one or two feet east of the western edge of the hard-surfaced slab.
When plaintiff started to cross the highway, the Guidry car was being driven in a southerly direction, in its proper lane of traffic, at a speed of 30 or 35 miles per hour, which was within the legal speed limit. Immediately prior to the collision the brakes of the Guidry car were applied with considerable force, causing the car to skid a distance of about 65 feet before plaintiff was struck. The skid marks began at about the center of the southbound lane of traffic and angled to the right until the right wheels of the car skidded off the hard-surfaced portion of the road onto the west shoulder about 10 to 15 feet before the car reached the point of impact. At the time plaintiff was struck the right wheels of the car were on the west shoulder of the road, about two feet from the western edge of the blacktopping. The left front portion of the car struck plaintiff, and the automobile came to a stop almost at the point of impact.
Plaintiff testified that there were no automobiles approaching from either direction when she started to cross, and that she did not see the Guidry car approaching until she reached the center of the highway. She says that she saw the lighted headlights of the Guidry car at that time, although she could not see the car itself. She offers no explanation as to why she continued into the southbound lane of traffic in front of this approaching vehicle, but since she incorrectly estimated that the car was two-tenths of a mile from her when she first observed it, we assume that she felt that she had sufficient time within which to complete the crossing before the car reached that point.
Young Guidry testified that Mrs. Campisi was in the center of the highway when he first saw her, that he was unable to see her before that time because his view was obstructed by another automobile traveling north, which met and passed him immediately prior to the time he saw plaintiff, and that although he applied his brakes immediately and endeavored to bring his car to a stop, he was unable to avoid striking her. He estimated that plaintiff was 50 or 60 feet in front of him when he first saw her, but concedes that it actually must have been a little further than that since the car skidded 65 feet.
Under either of these versions of the facts, we think the trial court erred in finding that Mrs. Campisi was free from negligence. In our opinion, the evidence clearly establishes that she was negligent in attempting to walk across the southbound lane of traffic directly in front of the approaching Guidry automobile when it should have been obvious to her that she could not make the crossing in safety. Her negligence in that respect was a proximate and contributing cause of the accident and bars plaintiff from recovery, unless it has been established, as plaintiff contends it has, that young Guidry had the last clear chance to avoid the accident.
In order for the doctrine of last clear chance to be successfully applied in this case, it is necessary that the following facts or circumstances be established: (1) that the pedestrian was in a position of peril of which she was unaware or from which she was unable to extricate herself; (2) that the driver of the motor vehicle actually *91 discovered, or was in a position where he should have discovered, the pedestrian's peril; and (3) that, at the time, the driver of the motor vehicle, with the exercise of reasonable care, could have avoided the accident. Ballard v. Piehler, La.App. 1 Cir., 98 So.2d 273; Newton v. Pacillo, La.App. 2 Cir., 111 So.2d 895; Wells v. Meshell, La.App. 2 Cir., 115 So.2d 648; Fontenot v. Travelers Indemnity Company, La.App. 3 Cir., 134 So.2d 330 (Cert. denied).
The principal issue presented here with reference to the applicability of the last clear chance doctrine is whether Guidry discovered, or by the exercise of reasonable care he should have observed, that plaintiff was in a position of peril in time for him to have avoided the accident.
Guidry's assertion that he was unable to see Mrs. Campisi until she reached the center of the highway is strongly supported by the testimony of Mrs. Rosalind Hebert, who was riding as a passenger in the Guidry automobile at the time of the accident. Mrs. Hebert testified that traffic on that road was heavy immediately prior to and at the time of the collision, and that the Guidry vehicle met four or five cars, all traveling in a northerly direction, at or about the time of the accident. She stated that when she first saw Mrs. Campisi the latter was about 50 feet in front of the Guidry automobile and that Guidry immediately blew his horn, applied his brakes and veered to the right in an unsuccessful attempt to avoid striking her.
Billy M. Matheny, who was standing at the front door of a residence located near the scene of the accident, testified that immediately before the collision occurred Mrs. Campisi had crossed the northbound lane of traffic directly in front of another automobile which was traveling in a northerly direction, and that the northbound car had its headlights burning at that time.
Plaintiff's grandson, Lloyd Wayne Campisi, testified that about five cars passed while he and plaintiff were waiting to cross the road, that he did not see plaintiff start across the highway, but that when he did notice that she was crossing, there were only two cars that he could see at that time. One of these cars was the Guidry vehicle approaching from the north, and the other was a vehicle approaching from the south. Mr. Campisi further testified:
"Q But you do remember there were cars going both ways along there.
"A Yes, sir.
"Q You realized it was a dangerous crossing.
"A Yes, sir, that's why I wanted to wait.
* * * * * *
"Q Go ahead.
"A When I looked up, she had already started. I didn't look at her while she was starting. I looked up after putting the bottles down, I was fooling around, then I saw she started.
"Q So actually, if you had seen her, you wouldn't have let her cross at that time, would you?
"A No.
"Q Mr. Campisi, as a matter of fact now, straightening your recollection, didn't your grandmother start across there just after a car passed going in the opposite direction, that you had tried to keep her from going in front of before?
"A I don't remember."
It appears to us that the testimony of the three eyewitnesses, other than plaintiff and the driver of the car, tends to support Guidry's statements to the effect that another vehicle blocked his view of Mrs. Campisi until she reached the center of the highway. Mrs. Campisi's own admission that she did not see the Guidry car until she reached the center of the highway, although she contends that she had looked in both directions, *92 also seems to confirm defendants' position as to this issue of fact. The testimony of all of these witnesses conflicts with that of plaintiff to the effect that there was no other traffic approaching from either direction at the time she started across the highway.
The trial judge did not specifically determine whether Guidry's view of Mrs. Campisi was obstructed prior to the accident, but he reasoned that if there was such an obstruction by a northbound car, Guidry should have seen plaintiff either before or after meeting that car, and thus, by the exercise of reasonable care, he could have avoided the accident.
The jurisprudence is well settled to the effect that a plaintiff relying on the doctrine of last clear chance bears the burden of establishing all the facts essential to make this doctrine applicable, and that these facts must be proved and will not be presumed. Franicevich v. Lirette, 241 La. 466, 129 So.2d 740; Phares v. Biggs, La.App. 2 Cir., 135 So.2d 507 (Cert. denied).
In our opinion, plaintiff in the instant suit has failed to establish that young Guidry saw, or by the exercise of reasonable care should have seen, that Mrs. Campisi was about to enter or attempt to cross the southbound lane of traffic in front of him in time for him to have brought his automobile to a stop before striking her. We conclude, therefore, that plaintiff has failed to establish that the driver of the automobile had the last clear chance to avoid the accident. See Fontenot v. Travelers Indemnity Company, supra; Bergeron v. Department of Highways, 221 La. 595, 60 So. 2d 4.
In view of our finding that plaintiff was chargeable with contributory negligence, and that she has failed to establish that the driver of the automobile had the last clear chance to avoid the accident, it follows that the judgment of the trial court permitting plaintiff to recover must be reversed.
For the reasons herein set out, the judgment appealed from is reversed, and judgment is hereby rendered in favor of defendants and against plaintiff, rejecting plaintiff's demands and dismissing this suit at her costs. All costs of this appeal are assessed to plaintiff-appellee.
Reversed.
TATE, Judge (dissenting).
If the majority opinion is correct, every Louisiana decision is wrong as a matter of law, of the many which have awarded pedestrians damages on the basis of the last clear chance doctrine as enunciated by the Supreme Court of Louisiana in the leading cases of Jackson v. Cook, 189 La. 860, 181 So. 195 and Rottman v. Beverly, 183 La. 947, 165 So. 153.
The majority has accomplished its result, so contrary to the established jurisprudence, by placing upon the plaintiff an insuperable burden of proof; it has essentially denied her recovery because of the unsupported possibility that an opposite-bound vehicle may have prevented the defendants' driver, young Guidry, from observing until too late this old lady crossing the street.
The facts are simple and essentially uncontested:
The plaintiff is an old lady, 72 years of age, five feet two inches in height, weighing 180 lbs., who walks with a slow gait, and is "somewhat physically impaired and unable to move with the agility of youth" (see Tr. 88, trial court's reasons for judgment).
The blacktopped pavement in front of her home is 24 feet in width. There are no pedestrian crosswalks in the vicinity, and the only way the old lady can cross from her home on one side of the street to her son's on the other, is to do just as she did, to wait for traffic to clear and then to cross.
Witness after witness testified that the visibility at the time of the accident was very, very clear. It was just after sunset, *93 and some of the vehicles had their lights on, although others did not. (It should be unnecessary to point out that vehicles were not required to place on their headlights until "one-half hour after sunset" under LSA-R.S. 32:290, the Highway Regulatory Act in force at the time; since visibility is still usually sufficiently good up until such time.)
Before she was struck by the defendants' motor vehicle, this slow-moving overweight old lady was able to hobble across 23 feet of the 24-foot highway, moving at a slight angle, facing away from the oncoming southbound vehicle driven by young Guidry. This, too, is absolutely uncontradicted.
Of course, as noted by Jackson v. Cook, cited above, the duty of the motorist towards the pedestrian included the duty to observe her in the motorist's left lane of the highway as she proceeded directly towards his path in his right lane, apparently oblivious of the approach of the vehicle in the other lane. This was specifically held under the facts of this leading decision, which noted, 181 So. 197: "`The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger.'"
It is as obvious to me as it was to the trial court that the cause of young Guidry's hitting this old lady just as she was about to step off the highway, was his failure to observe her earlier, even accepting young Guidry's testimony on direct examination (which, as we will note below, he qualified significantly on cross-examination).
This old lady was not skipping across the highway, she was hobbling across very, very slowlyeven young Guidry admitted that her gait was slow.
Guidry, who was driving to a party talking to his date (who was sitting close to him in the front seat), could have observed her earlier in her slow and perilous path across his lane. Instead of which, he admitted he did not see her until he was 50-60 feet distant (Tr. 165); which is somewhat corroborated by the circumstance that the skidmarks of his vehicle were 65 feet in length, and he struck her while his vehicle was still moving at 5-10 mph (Tr. 170-171) or just before he came to a complete stop.
Young Guidry claimed that the old lady was at the center-line of the highway when he first observed her. Tr. 170. If so, (since the old lady thereafter traversed 11 feet of Guidry's 12-foot lane at her slow hobbling gait before the impact), young Guidry (who was approaching at a speed at least 10-15 times that of the old lady) was at the time a sufficient distance away that is, 110 to 165 feet distant, so that he should have been able to stop in time to have avoided the accident (he did bring his vehicle to a stop in 65 feet after he applied his brakes).
If young Guidry simply failed to see the old lady until she was much closer to the far edge of the pavementwhich is more likely since he did not in fact apply his brakes until less than 65 feet from the point of impact, the defendants are liable because of his negligent failure to observe sooner the apparent peril of the aged pedestrian in his path, under the last clear chance doctrine applied by Louisiana courts (save in the present instance, if the majority opinion stands) since the classic decision in Jackson v. Cook, cited above.
How then does the majority hold that the plaintiff is not entitled to recovery by reason of the last clear chance doctrine?
The majority apparently accepts young Guidry's self-exculpating version (on direct examination) to the effect that an oncoming vehicle in the other lane blocked Guidry's view of the old lady until she reached the center-line of the highway. As I have attempted to demonstrate previously, even accepting the testimony that young Guidry could not have seen the old lady before she reached the center-line, the young driver still had the last clear chance *94 to avoid the accident because of the great distance north of the old lady he had to be, for her to have been able afterwards to cross 11 feet before the impact at her very very slow gait. Thus, the majority is clearly wrong as a matter of law in holding that, even under these facts, the last clear chance doctrine does not apply.
As did the trial court, however, I find young Guidry's testimony of the blocking vehicle most difficult to accept, and young Guidry himself qualified it on cross-examination. (As the trial court noted, it took the old lady such a comparatively long time to cross from her shoulder to the center-line after this phantom vehicle passed hershe could not cross in front of it, that young Guidry must have crossed this opposite-bound vehicle a very considerable distance away from the point of impact.)
What the majority overlooks, in giving any weight to this irrelevant testimony, is that young Guidry under cross-examination made repeated admissions that actually he did not remember whether he first saw Mrs. Campisi just as he crossed the oppositebound car or a little later. (This is material, because all witnesses admit that, within the five minutes before the accident, several cars had passed on northward; young Guidry, in the natural desire of all of us to deny fault in causing injury to another, may have later remembered one of these. However, all witnesses other than Guidry say that the only northbound traffic in sight at the time of the old lady's crossing was, from Guidry's point of view, far on the other side of the old lady.)
As this young driver stated, Tr. 172:
"Q. Now isn't it true that you don't remember whether or not you saw her just after the car passed you a little while after the car passed you?
"A. That's right."
(See also another admission to such effect at Tr. 173.)
Thus the plaintiff positively denied that there was any intervening car which could have blocked young Guidry's observation of her as she crossed the highway, while young Guidry himself frankly admits on cross-examination that the opposite-bound car may have crossed him back some distance before he admits to first observing the old lady at the center-line.
The other three witnesses to the accident positively negative the absence of any such intervening car.
The majority bases its suggestion (and it is little more than that, actually) that there may have been such another car only on isolated excerpts from the testimony of these three witnesses. However, when these three witnesses were specifically questioned on the point, they absolutely negatived any such intervening car, in my opinion.
For instance, the plaintiff's grandson was with her at the time of the accident. He naturally wanted to show how cautious he had been and that no lack of caution on his part was the fault of the accident.
Nevertheless, when asked as to the specific point under discussion, he stated positively, Tr. 137:
"Q. Now when you say you saw the car that was being driven by Mr. Guidry, how far did you say the car was away?
"A. It was a good piece down the road.
"Q. Did other cars pass along there before his car got to where you were?
"A. Yes, they had other cars coming. Then a few cars passed, and I looked and the [Guidry] car was way down there and there was one down this way. Those were the only two cars I could see at the time. There weren't a lot of cars passing before."
*95 The young teenage date who was in the car with the young Guidry driver, when questioned as to this point, positively stated, Tr. 175:
"Q. What other traffic was on the road?
"A. Well, it was pretty heavy, there was heavy traffic on the road. There was I'd say four to five cars coming when we were going. Just in front of the Campisi home there were about four or five cars coming in the opposite direction, to the north."
It is obvious that these cars "coming" while she and young Guidry were "going" were on the other side of Mrs. Campisi, because the old lady could not have come out from behind the fifth car with her slow gait and still have been able to cross even to the center-line, let alone to the far side of the pavement, before the impact. If the vehicles were at the time "just in front of the Campisi home", as the witness testified, obviosly the old lady had already crossed in front of this northbound traffic.
This is corroborated by the remaining witness to the accident, one Matheny, whom the trial court in most particulars properly disregarded as an obviously biased witness. However, even this witness corroborated the version of the traffic immediately prior to the impact given by the plaintiff's grandson and corroborated by the young date's testimony indicating that any opposite-bound traffic was below the plaintiff, Mrs. Campisi, and not between her and young Guidry.
Under cross-examination, this witness was pinned down on this point, an admission which stands as uncontradicted by the remainder of his testimony (see page 14 of his deposition at Tr. 84):
"Q. * * * Isn't it a fact that you saw one car traveling north which was south of the impact?
"A. Right.
"Q. It was south of the impact at the time that the impact occurred? [i. e., on other side of the old lady, so far as young Guidry's concerned]
"A. Right.
"Q. That's the only other traffic you saw other than the Guidry vehicle?
"A. As best to my knowledge, that's all I can remember.
"Q. Let's make sure we've got this straight now. It was athe Guidry vehicle was traveling south?
"A. Right.
"Q. The car we are referring to right now was traveling north?
"A. Traveling north.
"Q. And it was south of the impact when the impact occurred?
"A. Right.
"Q. And it was in the northbound traffic lane of South State Street?
"A. Right.
"Q. And the Guidry vehicle was in the southbound lane?
"A. Right."
How, it may be asked, can the majority disregard this virtually uncontradicted testimony proving that there was no intervening northbound car between Mrs. Campisi and the defendant driver blocking his view of her at the time she started her crossing?
The majority is honest enough not to hold that the blocking vehicle is proven by the testimony of these other witnesses. The majority simply observes that such testimony "tends" to support the young driver's exculpatory version of an intervening vehicle which blocked his viewmeaning, I can only suppose, that such testimony does indicate that there was another vehicle beside Guidry's on the road, whereas the *96 old lady said Guidry's was the only one in sight in either direction. This other vehicle being on the other side of the old lady, however, of course proves that it could not have blocked young Guidry's view of the old lady crossing the street.
The majority seems to have misinterpreted Franicevich v. Lirette, 241 La. 466, 129 So.2d 740, as requiring a plaintiff to prove beyond a reasonable doubt (instead of by a preponderance of the evidence) that he is entitled to recovery under a last clear chance doctrine. The majority apparently says that the plaintiff did not prove that young Guidry should have seen her crossing the road in time to avoid the accident, just because young Guidry himself says he could not have seen her sooner because of a phantom intervening careven though the intervening car is disproven by the testimony of all the other witnesses.
Before concluding, I must again reiterate that, even if there were an intervening vehicle (and there is none proved), then the plaintiff should have recovery under the last clear chance doctrine upon the defendant driver's own admission that he saw this slow-moving old pedestrian when she was at the center-line of the highway, but nevertheless ran her down after she was thereafter able at a very slow gait to cross 11 of the 12 remaining feet of the driver's lane.
The holding of the majority, in this case is clearly contrary to the legal principles and the holdings under somewhat similar facts in Belshe v. Gant, 235 La. 117, 102 So.2d 477, Broussard v. Thompson, La. App. 3 Cir., 128 So.2d 477, and Zachery v. Southern Farm Bureau Cas. Ins. Co., La. App. 1 Cir., 116 So.2d 847, among many other cases. Insofar as the majority seems to have exculpated the young driver from observing the aged pedestrian hobbling across the road so long as she was in the other lane, as she hobbled directly towards his path oblivious of the danger, the majority opinion seems to be flatly in conflict with Jackson v. Cook.
My brethren of the majority may not be in sympathy with the last clear chance doctrine as enunciated by the Louisiana Supreme Court. They may wish to turn the clock back to the golden days before Rottman v. Beverly and Jackson v. Cook. But, I suggest, it is not the function of inferior Louisiana courts to supply their own notions of what the law should be, instead of following the well-settled jurisprudence established by the Louisiana Supreme Court.
For these reasons, the writer must dissent.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., dissents from refusal to grant a rehearing.